**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| TRAVIS BLANK, | § | |
| | § | |
| **Plaintiff,** | § | |
| v. | § | CIVIL NO.  3:11-CV-1327-K-BK |
| | § | |
| R.N. LINDA BELL, | § | |
| | § | |
| **Defendant.** | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**

This cause is before the undersigned for a recommendation on Defendant's *Motion for Summary Judgment*.  Doc. 91.  For the reasons that follow, the Court recommends that the motion be **GRANTED**.

I.     **Procedural Background**

In his first amended complaint, Plaintiff, then a pretrial detainee, sued various individuals associated with the Rockwall County Jail ("the jail"), pursuant to 42 U.S.C. § 1983 for violations of his Fourteenth Amendment right to adequate medical care.  Doc. 19 at 1.  Plaintiff named as defendants Harold Eavenson, the Rockwall County Sheriff; Bob Guzik, the jail administrator; Linda Bell, the charge nurse for the jail; and Les Sandknop, the contracted primary care physician for the jail.  Doc. 19 at 1-2.  His claim stemmed from the Defendants' alleged failure to properly treat his Crohn's disease.[1]  Doc. 19 at 4-11.  The District Judge ultimately dismissed Plaintiff's claims as to Defendants Sandknop, Eavenson, and Guzik with prejudice, and that decision was upheld on appeal.  Doc. 27; Doc. 35; Doc. 78.  The Court denied two motions to

---

[1] Crohn's disease is defined as "a subacute chronic enteritis, of unknown cause, involving the terminal ileum and less frequently other parts of the gastrointestinal tract; characterized by patchy deep ulcers that may cause fistulas, and narrowing and thickening of the bowel by fibrosis and lymphocytic infiltration . . . symptoms include fever, diarrhea, cramping, abdominal pain, and weight loss."  *Stedman's Medical Dictionary* (27th ed. 2000) (available on Westlaw).

dismiss filed by Defendant Bell (hereafter "Defendant") in which she claimed qualified immunity.  Doc. 16 at 9-10; Doc. 27; Doc. 41 at 8-11; Doc. 48.

In February 2013, Plaintiff filed a second amended complaint with the assistance of appointed counsel.  He alleged that Defendant was liable for violating his Fourteenth Amendment rights because she (1) frequently denied his requests to see a doctor for treatment of his Crohn's disease; (2) deprived Plaintiff of his Crohn's medication as well as a prescription muscle relaxer he needed to ease his severe neck pain; (3) failed to administer a special diet to ease his Crohn's symptoms; (4) failed to obtain care for Plaintiff when he fell in the shower and injured his knee; (5) repeatedly refused to comply with hospital discharge instructions that he be seen by a gastroenterologist following discharge; and (6) took him off one of the prescription medications used for treating Crohn's disease.  Doc. 69 at 4-10.  Defendant now moves for summary judgment, again raising a qualified immunity defense.  Doc. 91.

## II.    Facts[1]

### A.  Plaintiff's Pre-Incarceration Medical History and Arrest

Plaintiff was diagnosed with Crohn's disease by his gastroenterologist, Dr. Roger Camp, in January 2009.  Doc. 93-2 at 3-4 (Deft. Appx., Dr. Camp med. recs.).  Dr. Camp started Plaintiff on a biweekly injection of the medication Humira shortly after his diagnosis.  Doc. 93-2 at 12 (Deft. Appx., Dr. Camp med. recs.).  Dr. Camp also prescribed oral medications Asacol and Entocort.  Doc. 93-2 at 5, 12 (Deft. Appx., Dr. Camp med. recs.).  Plaintiff's Asacol was to be administered in dosages of three pills administered twice daily.  Doc. 93-2 at 5 (Deft. Appx., Dr. Camp med. recs.); Doc. 104-3 at 200 (Pl. Appx., Pltf.'s Decl.).  Plaintiff also reported suffering from severe neck and shoulder pain dating back to 2006 or 2007 for which he received steroid

---

[1] The facts are drawn from the supporting appendices the parties submitted with their summary judgment briefs.

injections and took prescription narcotic pain medication and muscle relaxants.  Doc. 104-3 at 198 (Pl. Appx., Pltf's Decl.).  At the time of Plaintiff's incarceration in the jail, his muscle relaxer, Cyclobenzaprine, was to be administered three times a day, with the last dosage to be given at bedtime to aid Plaintiff in sleeping.  Doc. 104-3 at 200 (Pl. Appx., Pltf's Decl.).

Plaintiff was arrested in June 2009 on a federal warrant and incarcerated at the jail pursuant to an agreement with the United States Marshal's Service.  Doc. 104-1 at 3-13 (Pl. Appx., Jail recs.).  Pending his trial on federal charges, Plaintiff was incarcerated at the jail from June 30, 2009 until April 14, 2010, except for a period of time from January 12, 2010 through February 18, 2010 when he was in custody at the Federal Correctional Institution of Fort Worth ("FCI Fort Worth").  Doc. 104-1 at 20 (Pl. Appx., Jail med. recs.); Doc. 104-2 at 69-71 (Pl. Appx., Pltf. Depo).

   B.  *Defendant's Employment and Procedures at the Jail*

During Plaintiff's incarceration at the jail, Defendant worked for Rockwall County as the jail charge nurse, overseeing all nursing staff and inmate care.  Doc. 104-3 at 7-9 (Pl. Appx., Deft. Depo).  The jail incarcerated approximately 200 inmates.  Doc. 104-3 at 26 (Pl. Appx., Deft. Depo).  The jail contracted with Dr. Sandknop to serve as the jail doctor, and he went to the jail once a week to provide inmate care.  Doc. 104-3 at 17-19 (Pl. Appx., Deft. Depo).  Before Plaintiff's incarceration, Defendant worked as a Humira training nurse and had some prior experience with Crohn's disease patients taking Humira.  Doc. 104-3 at 3-5 (Pl. Appx., Deft. Depo.).

Defendant testified that dispensation of medication at the jail occurred at three set times throughout the day, with the last scheduled time shortly before the 5:00 p.m. dinner hour so diabetics could obtain the proper glucose levels before eating.  Doc. 104-3 at 33 (Pl. Appx., Deft.

Depo).  She averred that there was not sufficient jail staff to dispense medication at other times, she had no discretion to give a prescribed medication to an inmate at a later time on a consistent basis, and the only exception made was for inmates who were going through detoxification and needed a brief course of medication for that process.  Doc. 104-3 at 34-36, 41-42 (Pl. Appx., Deft. Depo).  Nurse Christy George, a subordinate of Defendant's, testified that it was possible to do so with a doctor's approval.  Doc. 104-3 at 162 (Pl. Appx., George Depo).  Defendant additionally testified that she could not give Plaintiff his prescribed narcotic pain reliever because an inmate coming to the jail under the authority of a federal agency is not allowed to receive narcotic medication pursuant to federal agency policy.  Doc. 104-3 at 42-43 (Pl. Appx., Deft. Depo).

*C.  Plaintiff's Medical Treatment in the Jail from June 30, 2009 to January 12, 2010*

Plaintiff contends that shortly after his intake at the jail, he informed Defendant of his Crohn's disease, neck injury, and special dietary requirements.  Doc. 104-3 at 198 (Pl. Appx., Pltf. Decl.).  Plaintiff avers that Defendant did not ensure that his dietary needs were met and, within days, he began to notice blood in his stools, which is a symptom of a Crohn's disease flare up.  Doc. 104-3 at 199 (Pl. Appx., Pltf. Decl.).  In addition, Plaintiff avers that for several days after intake, Defendant did not ensure that he received a lower bunk, which agitated his neck condition and caused him pain, although she did arrange for him to have a second mat to use as a pillow to ease his pain.  Doc. 104-2 at 83-84 (Pl. Appx., Pltf. Depo); Doc. 104-3 at 79 (Pl. Appx., Deft. Depo); Doc. 104-3 at 199 (Pl. Appx., Pltf. Decl.).

On July 5, 2009, Plaintiff submitted his first Request for Service form asking to see a doctor regarding his Crohn's disease.  Doc. 104-2 at 82 (Pl. Appx., Pltf. Depo).  Plaintiff testified that he told Defendant he had a serious medical condition, was suffering from severe stomach

pain, and had been advised to speak to the doctor, but Defendant denied this request, stating that he would not see a doctor, and the jail had his medication.  Doc. 104-2 at 82 (Pl. Appx., Pltf. Depo).  On July 8, 2009, Plaintiff complained to Nurse George about the large amount of blood in his stools as well as his abdominal cramping, but he was not able to provide a stool sample for testing.  Doc. 104-1 at 15 (Pl. Appx., Jail med. recs.).

On July 12, 2009, Plaintiff did not receive one dose of his muscle relaxer, Cyclobenzaprine, which he informed Defendant about through a Request for Service that same day.  Doc. 104-1 at 41 (Pl. Appx., Jail recs.).  The next day, Defendant responded on the form "Request noted.  Continue current."  Doc. 104-1 at 41 (Pl. Appx., Jail recs.).  On July 16, 2009, Plaintiff informed the medical staff that he needed a refill of his Cyclobenzaprine, and he submitted a Request for Service stating that he was experiencing "terrible radiating pain," in his neck and could "barely move without terrible pain."  Doc. 104-1 at 42 (Pl. Appx., Jail recs.).  He stated in a July 22, 2009 Request for Service that his Cyclobenzaprine prescription was not timely refilled despite Defendant's assurance that she would take care of it, so he did not receive that medication for two days.[2]  Doc. 104-1 at 43 (Pl. Appx., Jail recs.); Doc. 104-3 at 201 (Pl. Appx., Pltf. Decl.).

Plaintiff complained of his Crohn's disease flare up to Defendant again on July 28, 2009.  Doc. 104-1 at 16 (Pl. Appx., Jail recs.).  Defendant arranged for Plaintiff to receive the same type of anti-diarrheal medication that he took at home as well as "pepto" tablets to keep on his person.  Doc. 93-5 at 25 (Deft. Appx., Deft. Decl.).  Plaintiff asserts that on August 3, 2009, he notified Defendant that he was bleeding internally and requested to see a doctor, but Defendant refused

---

[2] In the Declaration he submitted in support of his summary judgment opposition, however, Plaintiff stated that when he informed Defendant that he needed the refill, she told him "good luck in getting your meds" and walked away from him.  Doc. 104-3 at 200-01 (Pl. Appx., Pltf. Decl.).

Plaintiff's request and told him there was nothing she could do for his condition.  Doc. 104-3 at 199 (Pl. Appx., Pltf. Decl.).  During a detention hearing on August 5, 2009, before United States Magistrate Judge Don Bush, Plaintiff complained about inadequate medical treatment at the jail, and Judge Bush directed the Marshal's Service to look into whether his Crohn's disease was being properly treated.  Doc. 104-1 at 112 (Pl. Appx., Court minutes); Doc. 104-3 at 199 (Pl. Appx., Pltf. Decl.).  Shortly thereafter, Defendant prepared a "Med Pass," dated August 8, 2009, allowing Plaintiff to receive on an as-needed basis an anti-diarrheal medication, Tramadol for pain relief, and his Cyclobenzaprine.  Doc. 104-1 at 76 (Pl. Appx., Jail recs.).

On August 10, 2009, Defendant received an email from the U.S. Marshal's Office, in which she first learned that Plaintiff was complaining of improper medical treatment.  Doc. 93-1 at 45 (Deft. Appx., Marshal's email); Doc. 93-5 at 25 (Deft. Appx., Deft. Decl.).  Defendant responded to the email by delineating the actions taken by the jail's medical staff to treat Plaintiff's neck pain and Crohn's disease.  Doc. 93-1 at 44 (Deft. Appx., Bell email).

Also on August 10, Plaintiff complained of neck pain and requested to see a doctor.  Doc. 93-1 at 36 (Deft. Appx., Jail recs.); Doc. 93-5 at 25 (Deft. Appx., Deft. Decl.).  Defendant attests that in response to this request, she arranged for Plaintiff to see Dr. Sandknop the following day.  Doc. 93-1 at 36 (Deft. Appx., Jail recs.); Doc. 93-5 at 25 (Deft. Appx., Deft. Decl.).  This visit was arranged slightly over a month after Plaintiff requested to see the doctor on July 5.  Doc. 104-3 at 75, 85-86 (Pl. Appx., Deft. Depo.).  Defendant acknowledged that she had the ability to arrange for patients to see Dr. Sandknop, and testified that she did not know why the lapse was that long, but if a patient was in bad shape, medical staff did not hesitate to send him to the hospital.  Doc. 104-3 at 78-79 (Pl. Appx., Deft. Depo.).  In early to mid-August 2009, Plaintiff continued to suffer from neck pain which he reported to be severe and worsening.  Doc. 104-1 at

45-46, 48 (Pl. Appx., Jail recs.).  Defendant scheduled Plaintiff for a follow-up appointment with Dr. Sandknop, who saw Plaintiff and prescribed him medication on August 11, and another member of the medical staff gave him a warm compress.  Doc. 104-1 at 16, 45-46 (Pl. Appx., Jail med. recs.).

Plaintiff submitted Requests for Service on August 22 and 23, 2009, complaining that his Crohn's disease was flaring up with symptoms including painful bowel movements and loss of appetite, and he asked to see a doctor.  Doc. 104-1 at 47 (Pl. Appx., Jail recs.).  Plaintiff saw Dr. Sandknop again on August 25, 2009.  Doc. 104-2 at 97-98 (Pl. Appx., Pltf. Depo).  According to Plaintiff, Defendant was present during Dr. Sandknop's August 25th examination, and Dr. Sandknop stated to Defendant that Plaintiff should avoid spicy or fried foods.  Doc. 104-2 at 99 (Pl. Appx., Pltf. Depo).  Plaintiff alleges that Defendant nevertheless failed to follow this instruction that he be given a special diet.  Doc. 104-3 at 200 (Pl. Appx., Pltf. Decl.).

In September 2009, Plaintiff fell in the shower and injured his right knee.  Doc. 104-3 at 201 (Pl. Appx., Pltf. Decl.).  Plaintiff contends that he submitted a Request for Service to receive treatment for the injury, which Request is not in the record, but Defendant did nothing to help him.  Doc. 104-3 at 201 (Pl. Appx., Pltf. Decl.).  Following Plaintiff's release from the jail, he underwent corrective arthroscopic surgery on his right knee.  Doc. 104-2 at 166 (Pl. Appx., Pltf. Depo.).  Plaintiff asserts that until that time, he experienced pain as a result of his injury.  Doc. 104-2 at 167 (Pl. Appx., Pltf. Depo.).

Twice in September 2009, Plaintiff claimed that he did not receive the proper dosage of Asacol medication for his Crohn's disease, and he surmised that Defendant arranged for that to happen because she was the charge nurse.  Doc. 104-3 at 201 (Pl. Appx., Pltf. Decl.); Doc. 93-2 at 88-89 (Deft. Appx., Pltf. Depo.).  On October 5, 2009, Plaintiff did not receive his proper

Asacol dosage, and from October 6 through 8, 2009, he received none of his medications.  Doc. 104-2 at 104-06 (Pl. Appx., Pltf. Depo.).  Defendant acknowledged that the jail was out of Asacol and apologized in a written response to Plaintiff's Request for Service, noting that she had just received approval for the refill from the Marshal's Service.  Doc. 104-1 at 51 (Pl. Appx., Jail recs.); Doc. 104-3 at 105-06 (Pl. Appx., Deft. Depo.).

On October 8, 2009, Plaintiff submitted a Request for Service complaining of his Crohn's disease symptoms, including bloody stool, severe pain, and pain while eating -- especially with food he was not supposed to eat -- and he requested to see a specialist or to go to the hospital. Doc. 104-1 at 52 (Pl. Appx., Jail recs.).  Defendant acknowledged Plaintiff's complaints of pain, noting that he had just restarted his Asacol the prior evening and that she had corrected an error so that he could once again receive Tramadol, a pain reliever.  Doc. 104-1 at 52 (Pl. Appx., Jail recs.).  Plaintiff's Humira was administered on schedule on October 31 and November 13, 2009. Doc. 104-1 at 18 (Pl. Appx., Jail med. recs.).

On November 15, 2009, jail medical personnel responded to Plaintiff's jail cell to find him yelling, demanding to be taken to the hospital, and complaining of abdominal pain and internal bleeding.  Doc. 104-1 at 18 (Pl. Appx., Jail med. recs.).  Nurse Vivian Domorji notified jail staff to send Plaintiff to the emergency room.  Doc. 104-1 at 18 (Pl. Appx., Jail med. recs.). Plaintiff was received at the emergency room and was returned to the jail that same day after his condition stabilized.  Doc. 93-2 at 20 (Deft. Appx., Hosp. recs.).  Plaintiff states that hospital staff told him that he was dehydrated, anemic, had an elevated pulse, and had inflamed bowels. Doc. 104-3 at 202 (Pl. Appx., Pltf. Decl.).  The hospital discharge papers listed three medications and instructed Plaintiff to follow up with a specified gastroenterologist or a "Prvt MD" within two to three days.  Doc. 93 at 56 (Deft. Appx., Hosp. recs.).  Plaintiff informed Defendant of the

discharge instructions, and Dr. Sandknop prescribed the listed medications.  Doc. 104-1 at 19 (Pl. Appx., Jail med. recs.); Doc. 104-2 at 114-15 (Pl. Appx., Pltf. Depo.).

Plaintiff avers that, upon his return to the jail, Defendant told Plaintiff not to demand to be sent to the hospital again, and said, "You're in jail. Get used to it," or words to that effect. Doc. 104-2 at 115 (Pl. Appx., Pltf. Depo.).  Plaintiff informed Defendant that the reason he had to go to the hospital was because of her refusal to authorize a special diet, her refusal to allow him to see a gastroenterologist, and her failure to consistently administer his medications according to their prescribed regimen.  Doc. 104-2 at 100 (Pl. Appx., Pltf. Depo.); Doc. 104-3 at 203 (Pl. Appx., Pltf. Decl.).  He contends that Defendant's assistant told him he could buy food from the commissary if he did not like what was served to him.  Doc. 104-2 at 100 (Pl. Appx., Pltf. Depo.).  Defendant did not arrange for Plaintiff to see a specialist or any other doctor within the ordered two to three-day timeframe, but Dr. Sandknop did prescribe the listed medications for him.  Doc. 104-3 at 203 (Pl. Appx., Pltf. Decl.); Doc. 93 at 13 (Deft. Appx., Jail med. recs.).

On November 23, 2009, Plaintiff submitted a Request for Service complaining of nausea, dizziness, and vomiting.  Doc. 104-1 at 53 (Pl. Appx., Jail recs.).  Defendant examined Plaintiff the following day, noted that he was alert, oriented, and in no apparent distress.  Doc. 104-1 at 53 (Pl. Appx., Jail recs.).  Plaintiff reports that she informed him his blood pressure was low, his pulse was high, and he was probably dehydrated.  Doc. 104-2 at 120 (Pl. Appx., Pltf. Depo.). Defendant ordered two pitchers of ice water to be administered for five days, but Plaintiff received the ice water only once during the five-day span from November 25th through November 29, 2009, and Plaintiff submitted Requests for Service on November 25th and 26, 2009 notifying medical staff of the situation.  Doc. 104-1 at 19, 54 (Pl. Appx., Jail recs.); Doc. 104-2 at 120-21 (Pl. Appx., Pltf. Depo.).  Each request indicates that jail medical staff advised

appropriate personnel about the need to provide Plaintiff with ice water.  Doc. 104-1 at 54-55 (Pl. Appx., Jail recs.).  Thereafter, until his transfer to FCI Fort Worth on January 12, 2010, Plaintiff received his Humira injections on a bi-monthly basis with no further complaints noted in the jail's records.  Doc. 104-1 at 19-20 (Pl. Appx., Jail med. recs.).

### D.  Plaintiff's Medical Treatment in the Jail from February 18, 2010 to April 12, 2010

When Plaintiff returned to the jail from FCI Fort Worth on February 18, 2010, he had a fever of 101.7 degrees and was complaining of cold symptoms.[3]  Doc. 104-1 at 20 (Pl. Appx., Jail med. recs.).   Dr. Sandknop prescribed medications for Plaintiff that same day, and while Plaintiff's fever dropped, it did persist.  Doc. 104-1 at 20 (Pl. Appx., Jail med. recs.).  Plaintiff submitted a Request for Service on February 23, 2010, complaining of his swollen throat, chest pain, and Crohn's disease symptoms.  Doc. 104-1 at 57 (Pl. Appx., Jail recs.).  Dr. Sandknop saw Plaintiff, prescribed medications, and ordered blood work.  Doc. 104-1 at 21 (Pl. Appx., Jail med. recs.); Doc. 104-2 at 138 (Pl. Appx., Pltf. Depo.).  After the first lab results came back, Defendant informed Plaintiff that the test results were abnormal, and Dr. Sandknop ordered a second set of blood work on March 1, 2010.  Doc. 104-1 at 21 (Pl. Appx., Jail med. recs.); Doc. 104-3 at 121-22 (Pltf. Appx., Deft. Depo.); Doc. 104-3 at 205 (Pl. Appx., Pltf. Decl.).

Plaintiff attests that he was awakened on March 2, 2010 and told by a jail guard that Defendant was sending him to the hospital.  Doc. 104-2 at 140-41 (Pl. Appx., Pltf. Depo.).  Plaintiff contends that he learned at the hospital that he had a urinary tract infection, his white blood cell count was double the normal range, his kidney functions had worsened from dehydration, his bowels were inflamed, and he had a kidney infection.  Doc. 104-2 at 142 (Pl.

---

[3] Plaintiff also sued the doctor and nurse practitioner at FCI Fort Worth for deliberate indifference to his serious medical needs.  Doc. 93-5 at 20.  The district court dismissed the case due to Plaintiff's failure to exhaust his claims, and that decision was affirmed on appeal.  Doc. 93-5 at 20.

Appx., Pltf. Depo.); Doc. 104-3 at 205 (Pl. Appx., Pltf. Decl.).  The hospital discharge instructions (1) noted Plaintiff's diagnoses as constipation and pyelonephritis (kidney inflammation often due to local bacterial infection)[4]; (2) listed two medications to be prescribed; and (3) instructed Plaintiff to follow up with a designated urologist or a "Selected Referral MD" within a week.  Doc. 93 at 57 (Deft. Appx., Hosp. recs.); Doc. 104-2 at 142-43 (Pl. Appx., Pltf. Depo.); Doc. 104-3 at 205 (Pl. Appx., Pltf. Decl.).  Upon Plaintiff's return to the jail later that day, Dr. Sandknop was notified of the discharge and prescribed the medications designated on the instructions.  Doc. 93 at 16 (Deft. Appx., Jail med. recs.); Doc. 93-5 at 30 (Deft. Appx., Deft. Decl.).  Plaintiff did not see a doctor or specialist at that time.

On March 5, 2010, Defendant ordered that one of Plaintiff's Crohn's disease medications, Humira, not be administered until his fever and infection were resolved because Humira could exacerbate his condition.  Doc. 93-5 at 30 (Deft. Appx., Deft. Decl.); Doc. 104-1 at 22 (Pl. Appx., Jail med. recs.); Doc. 104-3 at 126-28 (Pl. Appx., Deft. Depo.).  On March 7, 2010, Plaintiff submitted a Request for Service form asking to see a doctor and for further tests. Doc. 104-1 at 58 (Pl. Appx., Jail recs.).  He complained that his stomach and kidneys severely and constantly hurt, he suffered from constant diarrhea and nausea, and he was struggling to eat, among other issues.  Doc. 104-1 at 58 (Pl. Appx., Jail recs.).  Plaintiff avers that he made frequent oral requests to Defendant to arrange for him to see a specialist for his Crohn's disease, but instead Defendant arranged for Dr. Sandknop to see Plaintiff on March 9, 2010.  Doc. 104-3 at 205-06 (Pl. Appx., Pltf. Decl.).  Dr. Sandknop ordered blood work, a change in Plaintiff's medication, and directed that Plaintiff's intake and output be monitored for the next ten days. Doc. 104-1 at 22 (Pl. Appx., Jail med. recs.).  Plaintiff had a temperature of 102.2 degrees, and

---

[4] Medical definition taken from *Stedman's Medical Dictionary* (27th ed. 2000) (available on Westlaw).

Nurse Bell had pitchers of ice water and sweet tea given to him and advised him to increase his fluid intake.  Doc. 93-5 at 31-32 (Deft. Appx., Deft. Decl.); Doc. 104-1 at 23 (Pl. Appx., Jail med. recs.); Doc. 104-2 at 149-50 (Pl. Appx., Pltf. Depo.).

On March 10, 2010, Plaintiff appeared before Magistrate Judge Bush again, who ordered that Plaintiff be seen by his gastroenterologist, Dr. Camp.  Doc. 104-3 at 206 (Pl. Appx., Pltf. Decl.).  Defendant was made aware of Plaintiff's court appearance, and the Marshal's Service initially scheduled the appointment with Dr. Camp for March 25, 2010.  Doc. 93-5 at 32 (Deft. Appx., Deft. Decl.); Doc. 104-1 at 69 (Pl. Appx., USMO rec.).  On March 11, 2010, Defendant arranged for Plaintiff to receive a special diet, specifying that Plaintiff was to receive no spicy or fried food and was to receive an extra piece of bread with each meal.  Doc. 93-5 at 32 (Deft. Appx., Deft. Decl.); Doc. 104-1 at 75 (Pl. Appx., Jail recs.); Doc. 104-2 at 150 (Pl. Appx., Pltf. Depo.).

That same day, after Plaintiff complained of diarrhea, neck pain, and night sweats, Dr. Sandknop prescribed medication and ordered more blood work.  Doc. 104-1 at 23 (Pl. Appx., Jail med. recs.).  Defendant also began administering probiotics and Ensure dietary supplements to him.  Doc. 104-1 at 23 (Pl. Appx., Jail med. recs.).  Defendant sometimes went to the store on her own time and purchased these supplements with her own money.[5] Doc. 93-5 at 33-34 (Deft. Appx., Deft. Decl.).  Sometimes she sat with Plaintiff to make sure that he would drink the supplements.  Doc. 93-2 at 145-46 (Deft. Appx., Deft. Decl.); Doc. 93-3 at 124-25 (Deft. Appx., Deft. Depo.).

On March 13, 2010, Plaintiff spiked a fever of 104 degrees, and Nurse George sent him to the emergency room.  Doc. 104-1 at 24 (Pl. Appx., Jail med. recs.).  Plaintiff was diagnosed with colitis, prescribed four medications, and advised to follow up with a designated

---

[5] Defendant is not sure if she was reimbursed for these purchases.  Doc. 93-5 at 34.

gastroenterologist or a "Selected Referral MD" within two to three days.  Doc. 93-2 at 26, 29-30 (Deft. Appx., Hosp. recs.).  Upon Plaintiff's return to the jail, he again informed Defendant of the discharge instructions.  Doc. 104-3 at 207 (Pl. Appx., Pltf. Decl.).  Defendant did not arrange for Plaintiff to see a doctor within the timeframe dictated by the discharge instructions, although Dr. Sandknop did prescribe the directed medications.  Doc. 104-1 at 24 (Pl. Appx., Jail med. recs.).

On March 15, 2010, Defendant emailed a Marshal's Service employee that Plaintiff was very sick, was losing weight rapidly, and had been hospitalized again.  Doc. 104-1 at 84 (Pl. Appx., Jail recs.).   The U.S. Marshal responded by asking if Plaintiff's appointment with Dr. Camp could be moved to an earlier date, at which point Defendant called Dr. Camp's office to inquire.  Doc. 104-1 at 24, 84 (Pl. Appx., Jail med. recs.).  The doctor was out that week, but the appointment was moved up by three days to March 22, 2010.  Doc. 104-1 at 24 (Pl. Appx., Jail med. recs.).

On March 17, 2010, Defendant advised Dr. Sandknop that Plaintiff was complaining of constant nausea.  Doc. 93 at 19 (Deft. Appx., Jail med. recs.).  Dr. Sandknop ordered a change in medication.  Doc. 93 at 19 (Deft. Appx., Jail med. recs.).  The next day, Defendant reported that Plaintiff was still nauseated, so Dr. Sandknop ordered that a different prescription medication be administered.  Doc. 93 at 19 (Deft. Appx., Jail med. recs.).  In the meantime, Defendant continued giving Plaintiff Ensure supplements, although Plaintiff refused them sometimes.  Doc. 93 at 19-20 (Deft. Appx., Jail med. recs.).

On March 22, 2010, Plaintiff was examined by Dr. Camp.  Doc. 93-2 at 8-9 (Deft. Appx., Med recs.).  Dr. Camp noted that Plaintiff had lost about 20 pounds since he had last seen him, and he "just look[ed] absolutely terrible" and "ten years older th[a]n when I saw him a year ago."

Doc. 93-2 at 8-9 (Deft. Appx., Med recs.).  Dr. Camp noted that Plaintiff had not had any recent

fever, he could not find anything specific, and Plaintiff denied any real pain.  Doc. 93-2 at 8-9

(Deft. Appx., Med recs.).  Dr. Camp's plan was to run blood tests, consider whether a

colonoscopy should be ordered, and possibly obtain stool studies.  Doc. 93-2 at 9 (Deft. Appx.,

Med recs.).   Plaintiff avers that Dr. Camp informed him during the examination that he needed

to be hospitalized, Doc. 104-3 at 207, but no instruction to that effect appears in Dr. Camp's

notes of the office visit.

      Shortly after Plaintiff's appointment, Defendant contacted Dr. Camp's office to inquire

whether Dr. Camp desired to restart Plaintiff on Humira, and he said no.  Doc. 93 at 20 (Deft.

Appx., Jail med. recs.); Doc. 93-3 at 117-19 (Deft. Appx., Deft. Depo).  On March 23, 2010,

Defendant ran several lab tests on Plaintiff.  Doc. 93 at 20 (Deft. Appx., Jail med. recs.).  On

March 26, 2010, Defendant left a message with Dr. Camp to discuss Plaintiff's lab results.  Doc.

93 at 22 (Deft. Appx., Jail med. recs.).  Dr. Camp contacted Defendant on April 1, 2010, and

confirmed the continued suspension of Humira.  Doc. 93 at 22 (Deft. Appx., Jail med. recs.).

While Dr. Camp's April 1 notes reflect the *possibility* that Plaintiff might need to be

hospitalized, there is no indication that he informed Defendant of that possibility or ordered it at

that time.  Doc. 104-2 at 13 (Pl. Appx., Med. recs.).

      On April 5, 2010, Plaintiff submitted another Request for Service form, asking to see a

gastroenterologist or go to the hospital and complaining of "unbearable" pain and increased

bloody bowel movements.  Doc. 93-1 at 23 (Deft. Appx., Jail med. recs.).  Defendant gave

Plaintiff some Ensure and notified Dr. Sandknop of Plaintiff's complaints.  Doc. 93 at 23 (Deft.

Appx., Jail med. recs.).  Defendant also contacted Dr. Camp regarding Plaintiff's condition, and

Dr. Camp directed that Plaintiff be admitted to the hospital, commenting, "We don't need this

kid dying in custody." Doc. 104-1 at 89 (Pl. Appx., Jail recs.); Doc. 104-3 at 140-41 (Pl. Appx.,
Deft. Depo.).  Within two hours, Defendant sent a request to Dr. Sandknop for direct admission
orders, sent the order to the Marshal's Service for approval, and forwarded the approval to the
hospital.  Doc. 93 at 23 (Deft. Appx., Jail med. recs.); Doc. 104-1 at 74 (Pl. Appx., USMO recs.).

Plaintiff was hospitalized for seven days.  Doc. 104-1 at 109 (Pl. Appx., Med. recs.).  He
weighed approximately 110 pounds, having lost more than 45 pounds since he arrived at the jail
in June 2009.  Doc. 93 at 69 (Deft. Appx., Med. recs.).  Plaintiff was diagnosed with rectal and
anal hemorrhaging, anemia, malnutrition, and abnormal weight loss.  Doc. 104-1 at 109 (Pl.
Appx., Hosp. recs.).  Following his discharge from the hospital, Plaintiff did not return to the jail
and was instead placed on conditional monitored release.  Doc. 93-2 at 53 & Doc. 93-3 at 7-9
(Deft. Appx., Pltf. Depo.); Doc. 93-5 at 36 (Deft. Appx., Deft. Depo.).  He commenced treatment
with Dr. Camp who restarted Plaintiff's Humira several weeks later in approximately mid-May
2010.  Doc. 93-2 at 17 (Deft. Appx., Med. rec. dated May 21, 2010, noting that Plaintiff had
"just started on the Humira").  Plaintiff's Crohn's disease was treated into remission between
November 2010 and January 2011. Doc. 104-3 at 208 (Pl. Appx., Pltf. Decl.).  Shortly after
Plaintiff's release to home care, he underwent cervical discectomy and fusion surgery on his
neck and arthroscopic surgery on his right knee.  Doc. 104-3 at 209 (Pl. Appx., Pltf. Decl.).

## III.    Applicable Law

### A. *Summary Judgment Standard*

Summary judgment is appropriate "if the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party is entitled to a judgment as a
matter of law." FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Once

the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotes omitted).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* (citation omitted). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

B.  *Section 1983 and Qualified Immunity*

Section 1983 "provides a federal cause of action for the deprivation, under color of law, of a citizen's 'rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994).  To state a claim under section 1983, Plaintiff must allege facts that show that (1) he has been deprived of a right secured by the Constitution and the laws of the United States, and (2) Defendant was acting under color of state law.  *See Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978).

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation omitted).  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  The qualified immunity inquiry involves two prongs that the Court must answer affirmatively before

an official is subject to liability: (1) whether the facts that a plaintiff has alleged make out a violation of a constitutional right and (2) whether the right at issue was "clearly established" at the time of defendant's alleged misconduct. *Pearson*, 555 U.S. at 232. A court may begin its assessment with either prong. *Id.* at 236 (*overruling in part Saucier v. Katz*, 533 U.S. 194 (2001)). A right is "clearly established" for purposes of qualified immunity if "[t]he contours of the right [are] sufficiently clear [such] that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In other words, the relevant inquiry "is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. Even if a violation occurred, a defendant is nonetheless entitled to immunity if her conduct was objectively reasonable in light of "law which was clearly established at the time of the disputed action." *Collins v. Ainsworth*, 382 F.3d 529, 537 (5th Cir. 2004).

A qualified immunity defense alters the usual summary judgment burden of proof. *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). Once an official asserts a qualified immunity defense, the burden shifts to the plaintiff to rebut the defense by establishing a material fact issue as to whether the official's allegedly wrongful conduct violated clearly established law. *Id.* The plaintiff bears the burden of negating qualified immunity, but all inferences are drawn in her favor. *Id.*

### C. Constitutional Right to Medical Care

The constitutional right of a pretrial detainee to medical care flows from both the procedural and substantive due process guarantees of the Fourteenth Amendment. *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 639 (5th Cir. 1996) (*en banc*). A pretrial detainee has a clearly established constitutional right not to be denied, by deliberate indifference, attention to his

serious medical needs.  *Id.* at 650.  Deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain," proscribed by the Constitution. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  A cause of action for deliberate indifference to an inmate's medical needs may be maintained if there is a delay in access to medical care that results in substantial harm.  *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993).  Deliberate indifference also can be shown by proving that jail officials refused to treat the detainee, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly show that they had a wanton disregard for the detainee's serious medical needs. *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001).  A prison medical official's "failure to alleviate a significant risk that the official should have perceived, but did not is insufficient to show deliberate indifference."  *Id.* (citation, alteration, and internal quotation marks omitted).  Conversely, deliberate indifference "cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm."  *Thompson v. Upshur County*, 245 F. 3d 447, 459 (5th Cir. 2001).  The "question whether . . . additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment" and is not actionable under section 1983.  *Estelle*, 429 U.S. at 107.  "At most it is medical malpractice, and as such the proper forum is the state court under the Texas Tort Claims Act."  *Id.*

        Under the "deliberate indifference" standard, a plaintiff also must establish that the defendants acted with subjective deliberate indifference to his need for medical care.  *Brown v. Strain*, 663 F.3d 245, 249 (5th Cir. 2011).  To show that level of indifference, a plaintiff must present evidence that: (1) the defendant had "subjective knowledge of facts from which an inference of substantial risk of serious harm could be drawn"; (2) the defendant actually drew

that inference; and (3) the defendant's response to the risk indicates that she subjectively intended that the harm occur. *Id.* (quotation marks omitted). Deliberate indifference thus requires actual knowledge and conscious disregard of the risk of harm to the plaintiff. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A prison official's knowledge of a substantial risk of harm may be inferred if the risk was obvious. *Id.* at 825. Nevertheless, "courts should be careful to ensure that the requirement of subjective culpability is not lost. It is not enough merely to find that a reasonable person would have known, or that the defendant should have known . . ." *Id.* at 843 n.8.

## IV.   Arguments and Analysis

### A.  *Parties' Motions to Strike*

As an initial matter, the parties object to portions of each other's supporting evidence. Doc. 105; Doc. 115. In relevant part, Plaintiff objects to statements from (1) Defendant's Declaration in which she surmises that Plaintiff exacerbated his medical condition to obtain pretrial release; and (2) Dr. Sandknop's Declaration in which he states (a) why he believes certain special food items were given to Plaintiff, and (b) that he would have reviewed an earlier progress note entry when making a medical decision.[6] Doc. 105 at 3-4. Those statements played no part in the Court's recommendation, so any objections thereto are moot. Plaintiff further objects to Dr. Sandknop's statement in his declaration that "if I had ordered a special diet for [Plaintiff,] such would be included on the Progress Notes." Doc. 105 at 4. That statement was considered by the Court in making the instant recommendation. Plaintiff contends that the statement is speculative and not demonstrated to have been based on personal knowledge. Doc. 105 at 4. Upon consideration, the Court finds that the statement is grounded in Dr. Sandknop's

---

[6] Plaintiff initially objected to a third category of documents as well, but has since withdrawn that objection. Doc. 105 at 2-3. Doc. 119 at 2.

personal knowledge of the type of information that he routinely includes in his patients' progress notes.  *See also* Doc. 93-5 at 33 (Deft. Appx., Deft. Decl.) ("Dr. Sandknop's routine and practice was to include all of his orders in the written Progress Notes").  Plaintiff's objection to this statement should thus be **OVERRULED**.

Defendant objects to Plaintiff's use of various medical records for the purpose of showing necessary medical treatment, medical opinions, medical conclusions and/or subject matter for which specialized knowledge is needed.  Doc. 115 at 2.  She contends that Plaintiff has not designated any medical expert in this case and is thus not entitled to offer any expert opinions, testimony, or evidence on medical matters.  Doc. 115 at 2.  In particular, Defendant objects to:  (1) medical records at Plaintiff's appendix pages 82-121, 123-170, 172-173, 176-177, 179-184, 186-187; (2) the entire two paragraphs, and all evidence cited in support, on pages 44-45 of Plaintiff's summary judgment response brief, discussing Plaintiff's alleged damages.  Doc. 115 at 3.  With the exception of the document contained at Plaintiff's Appendix page 104, Doc. 104-1 at 112, the Court did not rely on any of this evidence in making the instant recommendation.  As such, Defendant's objections to that evidence are moot.  The document contained at Plaintiff's Appendix page 104 is not a medical record, it is Court minutes from Plaintiff's August 5, 2009 appearance before Judge Bush.  Accordingly, Defendant's objection to this evidence should be **OVERRULED**.

Defendant additionally objects to several paragraphs in Plaintiff's Declaration (4-6, 10, 13, 16, 18-19, 23-24, 26, 28, 30, 33-34), largely on grounds that the statements made therein are speculative, conclusory, and based on medical knowledge that Plaintiff does not have.  Doc. 115 at 3-5.  Defendant's objections as to paragraphs 6, 13, 23, and 34 should be **OVERRULED** insofar as Plaintiff's statements about his personal medical history and the treatment he has received are well

within his personal knowledge and do not require expert opinion.[7]  FED. R. EVID. 602; *see Huff v. Jackson*, No. C-11-149, 2013 WL 625045, *6 (S.D. Tex. 2013) (denying as overly broad a motion *in limine* to the extent that the defendant sought exclusion of "[a]ny comment ... by the Plaintiff of any medical record, or any medical condition ... other than his own present sense personal physical perception" on the grounds that such comments would be speculative and represent "improper opinion.").  The Court did not rely on any of the other statements to which Defendant objects in making the instant recommendation, so Defendant's objections to those statements are moot.

   B.  *Defendant's Denial or Delay of Plaintiff's Access to Dr. Sandknop*

   Plaintiff contends in his complaint that Defendant prevented him from seeing Dr. Sandknop on several occasions.  Doc. 69 at 4, 6-9.  Defendant argues that the evidence establishes that she never denied Plaintiff access to Dr. Sandknop, and Plaintiff's desire to see Dr. Sandknop more frequently is not actionable.  Doc. 92 at 28-29.  Plaintiff responds that the evidence shows that Defendant failed to contact Dr. Sandknop about the deterioration of Plaintiff's condition for long periods of time, evincing deliberate indifference.  Doc. 103 at 29-30.  Plaintiff contends that given his frequent complaints, reported rectal bleeding, abdominal pain, and pronounced weight loss, the only reasonable conclusion is that Defendant inferred an obvious risk of serious harm.  Doc. 103 at 30-31.

---

[7] The relevant objected-to portion of paragraph 6 is "To alleviate the pain and discomfort experienced by my neck injury prior to my incarceration, I received epidural injections and took narcotic pain medication and muscle relaxants as prescribed by my doctor."  The objected-to portion of paragraph 13 is "The final daily dosage of Cyclobenzaprine was intended to provide relief for my neck to aid in sleeping and was prescribed to be administered at bedtime."  The relevant objected-to portion of paragraph 23 is "I learned that my white blood cell count was double the normal range, my kidney functions had worsened from dehydration, my bowels were inflamed, and my kidneys had become infected."  The relevant objected-to portion of paragraph 34 is "I underwent arthroscopic surgery on my right knee on May 14, 2010 as a result of my untreated knee injury suffered in September 2009."

Plaintiff admitted in his deposition that he was not aware of any evidence that Defendant specifically kept him from seeing Dr. Sandknop.  Doc. 93-2 at 81 (Deft. Appx., Pltf. Depo.).  Dr. Sandknop confirms, and the evidence demonstrates, that he saw Plaintiff on at least four occasions during Plaintiff's nine-month stint in the jail and was advised of his condition and made responsive orders on numerous other occasions, including following the three hospitalizations after which Plaintiff was returned to the jail.  Doc. 93 at 10-19, 23-24 (Deft. Appx., Jail med. recs.); Doc. 93-3 at 99 (Deft. Appx., Deft. Depo.); Doc. 93-5 at 40 (Deft. Appx., Sandknop Decl.).  Dr. Sandknop avers that Defendant did not keep him from treating Plaintiff.  Doc. 93-5 at 42 (Deft. Appx., Sandknop Decl.).  Moreover, the medical records demonstrate that Defendant was in frequent contact with Dr. Sandknop about Plaintiff's condition especially as his condition deteriorated.  Doc. 93 at 19, 23; Doc 93-1 at 36; Doc. 93-5 at 25; Doc. 104-1 at 45; Doc. 104-2 at 97-98; Doc. 104-3 at 205-06.  Viewing the record as a whole and in the light most favorable to Plaintiff, the undersigned does not find that Defendant acted with subjective deliberate indifference to Plaintiff's need for medical care or otherwise behaved with a wanton disregard for his medical needs.  *Brown*, 663 F.3d at 249; *Domino*, 239 F.3d at 756.

C.  *Denial of Access to a Specialist*

Plaintiff next contends that Defendant prevented him from seeing a specialist on several occasions.  (Doc. 69 at 6-9).  He relies heavily on the fact that on each of three hospital visits, his discharge paperwork referenced the name of a specialist for him to follow up with.  Defendant asserts that at the time of Plaintiff's confinement, medical care for Rockwall County inmates was only available from (1) Dr. Sandknop; (2) the hospital where Plaintiff had been treated; and (3) one orthopedic specialist, which was not relevant for purposes of treating Plaintiff's Chrohn's disease.  Doc. 92 at 33; *see* Doc. 93-3 at 30- 35, 81-82.  Defendant notes that Plaintiff's

discharge paperwork stated that he should see either the named specialist or a private general practitioner, and he was treated appropriately following each discharge by his treating physician, Dr. Sandknop.  Doc. 92 at 34-38.  Defendant maintains that Plaintiff had no constitutional right to be treated by a specialist.  Doc. 92 at 35-38.

Plaintiff responds that Defendant had broader access to medical specialists than she represented, and her failure to do get him to one was a conscious decision to continue an "easier but less efficacious course of treatment," which constitutes actionable deliberate indifference. Doc. 103 at 32.  Plaintiff asserts that (1) Defendant's knowledge of the discharge instructions, her contact and treatment of Plaintiff, and his declining health show that Plaintiff faced a substantial risk of serious harm if nothing further was done; and (2) Defendant's failure to intervene in Dr. Sandknop's clearly ineffective course of treatment supports a reasonable inference of deliberate indifference even though some medical care was provided.  Doc. 103 at 34.

As an initial matter, the evidence demonstrates that it is unlikely Defendant could have secured an appointment with a specialist for Plaintiff as she testified that specialists in the area had stopped accepting inmates as patients due both to the low amount they were paid and because their other patients did not like to see inmates in uniforms and handcuffs in their offices. Doc. 93-3 at 31-32, 34.  In fact, Defendant testified that she had complained to the hospital in frustration about hospital doctors advising inmates to follow up with a specialist or get medications she was not able to order, and Captain Guzik was aware of the problem too.  Doc. 93-3 at 34-35.  Moreover, at bottom, Plaintiff's complaint amounts to an unactionable disagreement about his course of medical treatment.  See Estelle, 429 U.S. at 107; Varnado v. Lynaugh, 920 F.2d 320, 321 (5th Cir. 1991).  Specialized treatment over general treatment is not

constitutionally required and, as such, Plaintiff had no constitutional right to see a specialist instead of Dr. Sandknop, his treating physician.

D. *Defendant's Denial or Delay of Plaintiff's Access to Medical Testing and Treatment*

1. Special Diet

Defendant argues that Dr. Sandknop did not *order* a special diet for Plaintiff but, at most, suggested that he avoid spicy or fried foods. Doc. 92 at 42. Plaintiff states in his declaration in opposition to summary judgment that he informed Defendant of his dietary requirements shortly after he arrived at the jail. Doc. 104-3 at 198. Plaintiff contends that he received a noncompliant diet from the time of his arrival, which aggravated his Crohn's disease. Doc. 103 at 34-35. He maintains that Defendant disregarded Dr. Sandknop's direct order that he be given a special diet, which constituted an obvious risk to his health. Doc. 103 at 35. In support, he points to a sentence in his declaration in which he states that "Dr. Sandknop instructed [Defendant] to administer to me a special diet absent any spicy or fried foods." However, this sentence is inconsistent with Plaintiff's deposition testimony wherein, when asked "Did [Dr. Sandknop] tell [Defendant] to administer [a special diet]?" Plaintiff responded "[Dr. Sandknop] said the inmate should avoid spicy or fried foods." Doc. 104-2 at 99. Telling Defendant what Plaintiff "should avoid" is not the same as rendering a medical order that Defendant administer a special diet to him. Plaintiff cannot avoid summary judgment by using statements in his declaration that conflict with his deposition testimony. *S.W.S. Erectors v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996). Moreover, Plaintiff's deposition testimony is consistent with Dr. Sandknop's and Defendant's averments that Dr. Sandknop did not order a special diet and, if he had done so, it would have been written in Plaintiff's medical record. Doc. 93-5 at 33, 41.

In any event, Defendant testified in deposition that she did request special meal items for Plaintiff, namely cold cut sandwiches, after she noticed Plaintiff was refusing food, asked him what he would eat, and he said he would eat the sandwiches.  Defendant averred that the request may have been written on a dry erase board in the jail kitchen or on a diet sheet which was not copied because staff did not make copies of the sheets at that time.  Doc. 93-3 at 62, 74-75. Plaintiff conceded receiving the cold cut sandwiches despite the absence of a diet sheet in the record.  Doc. 93-3 at 4-5.  Importantly, Plaintiff acknowledged that he did not discuss his dietary needs with Defendant after November 2009.  Doc. 93-2 at 143.  Indeed, Plaintiff stated during his deposition that Defendant took it upon herself to prepare a diet sheet in March 2010 specifying that he not be served spicy or fried foods and that he receive an extra slice of bread. Doc. 93-2 at 143.  Further, Defendant used her own time and money to obtain Ensure for Plaintiff and often sat and talked with him to make sure he drank it.  Doc. 93-2 at 145-46 (Pltf. Depo.); Doc. 93-3 at 120, 124-25 (Deft. Depo.); Doc. 93-5 at 33-34 (Deft. Decl.).  The undisputed medical testimony further demonstrates that there is no medically necessary diet specified for Crohn's patients, Defendant averred that she requested special food for Plaintiff simply for his comfort and as a courtesy, and Dr. Sandknop declared that the special food items that Defendant provided to Plaintiff were not medically necessary.  Doc. 93-5 at 32-33 (Deft. Decl.); Doc. 93-5 at 41 (Sandknop Decl.).  Even viewing the evidence in the light most favorable to Plaintiff, he has not demonstrated that Defendant refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in other conduct showing that she wantonly disregarded his serious medical needs. Domino, 239 F.3d at 756.

2.  Withholding of Humira

Plaintiff also takes issue with Defendant's decision to withhold one of his Crohn's medications, Humira.  Defendant asserts that while it is not clear who ordered the Humira to be withheld following Plaintiff's return from FCI Fort Worth, her later decision in March 2010 to continue to withhold the medication was necessary due to Plaintiff's fever and infection.  Doc. 92 at 40-41.  Plaintiff responds that Defendant's decision to continue to withhold his Humira was made without doctor approval, in violation of patient care protocol at the jail.  Doc. 103 at 39-40. Plaintiff surmises that Defendant's discontinuation of his Humira, together with her knowledge of his flare-up symptoms and health decline, show that Defendant knew that Plaintiff faced a substantial risk of serious harm because of her actions.  Doc. 103 at 40.  Plaintiff contends that Defendant's motivation for discontinuing his Humira – her medical judgment versus a desire to harm him − is a fact issue that is improper for resolution on summary judgment.  Doc. 103 at 40-41.

The undisputed evidence shows that, based on her training as a Humira nurse, Defendant knew that Humira should not be administered to someone with a fever and/or infection because of a risk of exacerbating the infection and even causing death.  Doc. 93-3 at 16-18, 116-17). Notably, Plaintiff's gastroenterologist, Dr. Camp, responded in the negative when Defendant asked him in March and April 2010 whether Plaintiff should be restarted on Humira.  Doc. 93 at 21-22; Doc. 93-3 at 117-18.  Indeed, Dr. Camp did not restart Plaintiff's Humira after Plaintiff's release until mid-May 2010.  Doc. 93-2 at 17 (Deft. Appx., Med. rec. dated May 21, 2010, noting that Plaintiff had "just started on the Humira").  Additionally, Dr. Sandknop agreed with Defendant's medical decision to not administer Humira to Plaintiff while he had an active fever and/or infection.  Doc. 93-5 at 41-42.

In light of the uncontroverted medical evidence, Plaintiff cannot demonstrate that Defendant knew Plaintiff faced a substantial risk of serious harm if she discontinued his Humira. To the contrary, the evidence establishes that Plaintiff would have been at greater risk for serious harm if he had been placed back on the medication.  Plaintiff thus cannot show that Defendant had any subjective intent to harm him by withholding the medication.  *Brown*, 663 F.3d at 249. Ultimately, Defendant's decision to not administer Humira to Plaintiff was a medically-supported judgment call.  Regardless of whether Plaintiff agrees with the decision, deliberate indifference cannot be found simply based on a disagreement regarding a course of medical treatment.  *Varnado*, 920 F.2d at 321 .

3.  Failure to Ensure Proper Administration of Asacol

Plaintiff next contends that Defendant violated his constitutional rights when she intentionally made sure that he did not receive the proper dosage of his Asacol medication on three occasions in the fall of 2009 and over a three-day period in October 2009.  Defendant argues that Defendant's subordinates were responsible for putting medication into envelopes which the jailers gave to the patients, and Defendant cannot liable held liable on a *respondeat superior* theory.  Doc. 92 at 49-50.  Plaintiff responds that the evidence demonstrates that Defendant was personally involved in his care regimen and was aware that he was experiencing a flare up, thus the evidence supports a finding that she inferred that he faced a substantial risk of serious harm if his medications were not properly administered.  Doc. 103 at 44.

The undisputed evidence in this case shows that Defendant's subordinates put medication in envelopes for the inmates, and the medication was dispensed by jailers.  Doc. 93-3 at 39-41 (Deft. Depo.)   Further, Defendant relied on her employees to notify her when medication needed to be reordered.  Doc. 93-5 at 26.  (Deft. Decl.).  Defendant avers that when she learned in

October that Plaintiff's Asacol had run out, she immediately requested a refill from the U.S. Marshal's service which was received three days later. Doc. 93-5 at 26 (Deft. Decl.). This timeline is consistent with Plaintiff's allegation that it took three days to get a prescription refilled in jail. Doc. 93-2 at 94-95 (Pltf. Depo.). Defendant responded to Plaintiff's Request for Service notifying her that his Asacol dosage was short on the same day he wrote it, apologizing and letting him know that she had already faxed the refill to the Marshal's Service for approval. Doc. 91-1 at 32. Viewing the evidence in the light most favorable to Plaintiff, he has not demonstrated that the isolated errors in his receipt of Asacol show that Defendant refused to treat him, intentionally treated him incorrectly, or engaged in other conduct that indicating that she wantonly disregarded his serious medical needs. *Domino*, 239 F.3d at 756. To the extent Plaintiff complains about Defendant's failure to ensure that her subordinates were handling medication correctly, his claim is impermissibly based on a theory of vicarious liability and should be dismissed. *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983).

4. Failure to Ensure Proper Administration of Cyclobenzaprine

Plaintiff also takes issue with Defendant's alleged failure to consistently administer his muscle relaxer, Cyclobenzaprine. Defendant reiterates that she was not responsible for packaging or administering medication to inmates during dispensation rounds, and any isolated occasions where Plaintiff did not receive his medication are insufficient to sustain a deliberate indifference claim. Doc. 50. Plaintiff responds that Defendant failed to ensure his Cyclobenzaprine was refilled even when he brought the need to her attention in advance and acted dismissively, stating "good luck getting your meds," when he asked about the refill. Doc. 103 at 47-48.

In sum, Plaintiff complains that he did not receive his dosage of Cyclobenzaprine approximately 15 times in the nine months he was housed in the jail.  With regard to the incident when Defendant allegedly dismissed Plaintiff's request to refill the medicine, it is notable that Plaintiff's Request for Service paints a different picture.  In that document, Plaintiff wrote that when he asked for the refill, Defendant "personally said she will get this refilled and that won't be a problem."  Doc. 93-1 at 39.  Further, the medical records reflect that Defendant took the necessary steps to obtain approval from the Marshal's Service for the medication, contacted the pharmacy to transfer the prescription to a different pharmacy together with Plaintiff's insurance information, and obtained the medication to be administered to Plaintiff.  Doc. 93 at 9 (Deft. Appx., Jail med. recs.); Doc. 93-1 at 44 (Deft. Appx., Jail recs.); Doc. 93-5 at 24 (Deft. Appx., Deft. Decl.).  A little over a month after Plaintiff's arrival at the jail, Defendant also issued Plaintiff a "Med Pass" with no stop date for Cyclobenzaprine so that he could have it as needed with each dispensation of medication by officers.  Doc. 93 at 10.

Viewing the record as a whole, there is no genuine issue of material fact.  The occasional instances on which Plaintiff did not receive his muscle relaxer did not constitute a violation of his constitutional rights especially considering that Defendant was not directly responsible for filling the daily medication packets.  Pearson, 555 U.S. at 232; Steele, 709 F.2d at 382.  Despite Plaintiff's implication, there is no evidence in the record to suggest that Defendant affirmatively participated in not filling the packets properly on occasion.  At most, Defendant's failure to ensure that Plaintiff had his Cyclobenzaprine 100 percent of the time was negligence, which is insufficient to sustain a cause of action under section 1983 for deliberate indifference.  Thompson, 245 F. 3d at 459.

*E.  Defendant's Failure to Provide Adequate Treatment for Plaintiff's Neck Injury*

Defendant argues that she repeatedly obtained pain medication for Plaintiff's neck problems, ordered an extra bed mat for him, issued a Med Pass for his muscle relaxer, scheduled an appointment for Plaintiff to see Dr. Sandknop about his pain, and performed other acts demonstrating that she did not act with deliberate indifference to his medical needs.  Doc. 93 at 48-49.  Plaintiff responds that his neurosurgeon prescribed his final dosage of Cyclobenzaprine to be administered at bedtime to aid him in sleeping, but Defendant did not arrange for his last daily dose to be delivered any later than the final medication dispensation round at 3:30 p.m, which caused Plaintiff to suffer pain in the evenings.  Doc. 103 at 45-46.  Plaintiff also suggests that Defendant should have (1) made a greater effort to bring Plaintiff's ongoing neck pain to Dr. Sandknop's attention; and (2) assisted him in obtaining narcotic pain medication.  Doc. 103 at 46-47.

Upon consideration, there is no genuine issue of material fact.  Defendant's failure to arrange for Plaintiff to be given his final daily dose of Cyclobenzaprine before bedtime does not amount to deliberate indifference.  Defendant testified that medication had to be dispensed in the jail at specified times due to staffing issues, and individualized dispensations were not possible for extended periods of time.  Doc. 104-3 at 34-36, 41-42 (Pl. Appx., Deft. Depo).  Although Nurse George testified somewhat differently – that a doctor could order that medication be given at different times – it is not clear that she was referring to the provision of medication over an extended duration, which could disrupt the jail's schedule and create staffing problems over time.

In any event, any conflict between Defendant's and Nurse George's testimony is not sufficiently material for Plaintiff to avoid summary judgment on this aspect of his claim.

Plaintiff has not presented sufficient evidence showing either that (1) Defendant drew the inference of a substantial risk of serious harm surrounding her failure to request a later dispensation time; or (2) that her response to the risk indicated that she intended for the harm to occur. *Brown*, 663 F.3d at 249. As she accurately points out, Defendant repeatedly obtained pain medication for Plaintiff's neck problems, ordered an extra bed mat for him, issued a Med Pass with no end date for his muscle relaxer, and scheduled two appointments for Plaintiff to see Dr. Sandknop about his pain, among other things. Finally, the cases Plaintiff cites denying summary judgment to prison officials who refused to give pain medication to prisoners involve much more egregious facts than those presented here. *See Williams v. Certain* Indiv. *Emps. Of Tex. Dept. of Corr.*, 480 Fed. Appx. 251 (5th Cir. 2010) (complete denial of pain medication following amputation of leg four days earlier); *Chapman v. Johnson*, 339 Fed. Appx., 446 (5th Cir. 2009) (denial of virtually all pain medication for more than two months to prisoner with un-set broken foot).

Defendant's failure to request that Plaintiff be given a narcotic painkiller also does not state a constitutional claim. Defendant testified that federal inmates in the jail's custody were not permitted to be administered narcotic drugs pursuant to federal policy. Doc. 104-3 at 42-43 (Pl. Appx., Deft. Depo.). It is immaterial that Nurse George was not aware of that policy; she did not deny its existence. Doc. 104-3 at 163 (Pl. Appx., George Depo.). Defendant's failure to seek a narcotic painkiller on Plaintiff's behalf was reasonably based on her understanding of jail policy. Looking at the record as a whole and viewing the facts in Plaintiff's favor, there is no genuine issue of material fact as to whether Defendant deliberately denied or delayed Plaintiff access to health care for his neck problems or even acted in so much as a negligent fashion. *Domino*, 239 F.3d at 756.

*F.  Defendant's Failure to Provide Treatment for Plaintiff's Knee Injury*

Defendant urges dismissal of Plaintiff's complaint about his knee, noting that the deposition testimony indicates that Defendant was not on notice of any constitutionally-protected serious health condition.  Doc. 93 at 47-48.  Plaintiff responds that after he fell in the shower, he experienced sharp pains whenever he was standing, and the Request for Service form he submitted to Defendant for his injury was ignored.  Doc. 103 at 49.

Defendant testified that she first learned of any issue with Plaintiff's knee when she attended Plaintiff's deposition in this case.  Doc. 93-3 at 92-93 (Deft. Appx., Deft. Depo.). Plaintiff initially stated during his deposition that he could not recall ever talking to Defendant about his knee or his need to see a doctor after falling.  Doc. 104-2 at 103.  He subsequently averred that he told Defendant he fell in the shower and hurt his knee, but he could not recall if he showed her his knee, which was not bruised but may have had some swelling.  Doc. 104-2 at 131-32.

Notably, Plaintiff was in the jail's infirmary seven times around the time he fell, from September to October 2009, and there is no mention in his medical record of any complaint about a knee injury.  Moreover, when Plaintiff had an x-ray of his knee done at FCI Fort Worth, the findings were negative.  Doc. 93-2 at 34.  On these facts, Plaintiff's theory as to his knee fails to raise a constitutionally-protected serious health condition.  In particular, he has not demonstrated that Defendant had subjective knowledge about his knee injury from which an inference of a substantial risk of serious harm could be drawn, that she actually drew that inference, and that she subjectively intended that any harm occur.  *Brown*, 663 F.3d at 249.

## IV.      Conclusion

For the reasons stated, the Court recommends that Defendant's *Motion for Summary*

*Judgment* (Doc. 91) be **GRANTED**.

**SO RECOMMENDED** on August 8, 2014.

RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE

**INSTRUCTIONS FOR SERVICE AND**
**NOTICE OF RIGHT TO APPEAL/OBJECT**

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n, 79 F.3d 1415, 1417 (5th Cir. 1996)*.

RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE